**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jack O. McNARY, Defendant-Appellant.**

**No. 78–2102.**

United States Court of Appeals,
Seventh Circuit.

Argued April 9, 1979.

Decided April 29, 1980.

Rehearing and Rehearing En Banc
Denied June 13, 1980.

Robert J. Weber, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U.S. Atty., Daniel W. Gillogly, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before TONE and BAUER, Circuit Judges, and BONSAL, Senior District Judge.*

BAUER, Circuit Judge.

Defendant-appellant Jack O. McNary, formerly Mayor of the Village of Lansing, Illinois, appeals from the judgment of conviction entered upon the jury verdicts finding him guilty on two counts of violating the Racketeer Influenced and Corrupt Organization (RICO) Act, Title 18, United States Code, Sections 1961 et seq., and on one count of violating the Hobbs Act, Title 18, United States Code, Section 1951. McNary further appeals from a special verdict returned by the jury pursuant to the RICO Act (18 U.S.C. § 1963(a)) finding that the defendant's proprietary interests in his businesses known as B & M Manufacturing Company and Ports of Call Travel Service were subject to forfeiture.

Of the numerous claims of error asserted on appeal, we address only one here:[1] whether the evidence was sufficient to sustain the verdict on Count II of the indictment charging that income derived from a pattern of racketeering activity, or the proceeds thereof, were invested or used by the appellant in the operation of Ports of Call Travel Service. Specifically, the appellant contends that in the absence of proof that illicit income was deposited directly into Ports of Call, the evidence that illicit income was commingled with legitimate income and ultimately invested into Ports of Call was insufficient to establish a violation of the RICO Act. We are unpersuaded by the arguments advanced in support of this contention, and affirm the conviction for the reasons set forth below.

I

In view of the numerous issues raised on appeal, including challenges to the sufficiency of the evidence, the following summary of the events from 1968 to 1973 which culminated in the indictment is necessary to an understanding of our decision. During this period the appellant served both as Mayor of the Village of Lansing and as President of the Village Board of Trustees. McNary also owned a window and door frame manufacturing business known as B & M Manufacturing Company and held a partnership interest in a family-owned travel agency known as Ports of Call.

A three count indictment was returned on November 17, 1977 and, as noted above, charged the appellant in Counts I and II with violations of the RICO Act[2] and in Count III with a violation of the Hobbs Act.[3] The two RICO counts charged the appellant with having received income derived from a pattern of racketeering activity and having directly or indirectly used a part of such income and the proceeds thereof in the operation of an enterprise engaged in or affecting interstate commerce. In Count I the enterprise is B & M Manufacturing Company; in Count II the named enterprise is Ports of Call Travel Service. The pattern of racketeering activity consisted of ten predicate offenses involving multiple acts of bribery[4] and extortion[5] in violation of state and federal statutes. Count III charged the defendant with extortion under color of official right in that the owners, builders and operators of the Salem Cross apartments paid the appellant the sum of $20,010.98 on account of his wrongful use of the power and authority of his office as the Mayor of the Village of Lansing. The ten predicate offenses, three

---

* The Hon. Dudley B. Bonsal, Senior Judge of the United States District Court for the Southern District of New York, is sitting by designation.

1. The appellant raises eight separate issues for review on appeal, only one of which compels presentation by published opinion. The remaining issues not meeting our standards of publication are decided in an unpublished order filed contemporaneously with this opinion. See Circuit Rule 35.

2. 18 U.S.C. §§ 1961, 1962(a), 1963.

3. 18 U.S.C. § 1951.

4. Illinois Bribery Statute, Ill.Rev.Stat., ch. 38, § 33–1(d).

5. Hobbs Act, 18 U.S.C. § 1951.

of which were combined to form the substance of Count III, arose out of five separate real estate transactions in the Village of Lansing. For purposes of clarity, the evidence adduced at trial with respect to these five transactions, viewed in the light most favorable to the Government [6], will be described separately.

*SALEM CROSS*

In 1968, the property which ultimately became the site of the Salem Cross apartment complex was vacant and zoned for single family residence use. At that time, six and one-half acres of the property (referred to as Parcel 1 at the trial) were being acquired by a partnership consisting of Harry Rodenburg, a Lansing attorney; Joseph Griffin, a builder and developer; and a Mr. Gardner. In September 1968, the Village Zoning Board of Appeals recommended approval of the partnership's application to rezone Parcel 1 to permit a multiple family development of 126 dwelling units. In November 1968, Mr. Gardner approached McNary about purchasing Gardner's one-third interest in the partnership for the price of $9,000. McNary expressed interest in the investment and, because he did not have the funds himself, conferred with Gerald Pals, a real estate broker who had known McNary and his position as Mayor of Lansing since 1957.[7]

On or about November 15, 1968, McNary telephoned Pals and asked him to come to McNary's office at B & M Manufacturing Company. After the meeting, McNary and Pals visited the site of the Salem Cross property, where McNary discussed the details of the proposed investment and offered Pals one-half of his one-third interest in the property if Pals would advance McNary the $9,000 purchase price. Pals, in turn, conferred with his associates, Judd Dalenburg and Herbert Pals. As a result, Dalenburg made out his check for $9,000 which was given to McNary by Pals on November 18, 1968. In return, McNary executed an agreement in which he assigned fifty-percent of his one-third interest in the property to Pals, as trustee.

In January 1970, Pals, on behalf of the venture, obtained a contract with Richard Mook and Gordon Dicke to purchase Salem Cross. The contract was subject to a number of contingencies, including the rezoning of Parcel 2 and the issuance of building permits. Rodenburg, on behalf of the venture, then acquired the adjacent half acre (Parcel 2) for assemblage with the six and one-half acres (Parcel 1). Because Parcel 2 was zoned for single family, Rodenburg applied to the Village for a rezoning to permit multiple development in conjunction with Parcel 1. On April 29, 1970, a hearing was held before the Lansing Zoning Board of Appeals (ZBA) on the petition for a zoning change. At the hearing, ZBA Chairman Joseph Markby stated that he believed Pals had been dishonest in not disclosing his interest in Parcel 2, and demanded that Pals and Rodenburg, who were in attendance at the meeting, disclose at a subsequent hearing the identity of all persons with an interest in the development project. The ZBA then recommended that the zoning petition be denied. After the ZBA hearing, Pals went to see McNary and explained what had transpired at the meeting. McNary had already been informed of what had taken place and advised Pals that he would handle the matter.

On June 9, 1970, the Salem Cross zoning petition came before the Village Board. McNary permitted Rodenburg to address the Board with respect to the zoning request for the Salem Cross project. At that time, all six members of the Board unanimously voted to grant the petition subject to the approval of the Village Plan Commission. On August 10, 1970, the Plan Commission recommended approval of the plan of development for the Salem Cross project. At no time subsequent to the ZBA meeting of April 29, 1970 did anyone with an inter-

---

6. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Guevara*, 598 F.2d 1094, 1096 (7th Cir. 1979).

7. Pals was the principal witness for the prosecution and testified under a grant of immunity, a fact revealed to the jury.

est in the project return to the ZBA as requested nor did McNary ever disclose to any Village official that he held an interest in the project.

The sale to Mook and Dicke was closed in three steps. The first step, in May 1971, entailed conveyance of title to Mook and Dicke and payment of a portion of the purchase price. The second step, in August 1971, entailed a payment of a portion of the purchase price under a letter of direction specifying to whom the disbursements were to be made. McNary's name was intentionally excluded from the letter, and he instructed Pals to prepare his share of the proceeds, which amounted to $12,857.60, in the form of a check made payable to the First National Bank of Lansing. Pals delivered the check to McNary, which he deposited into his B & M account. The third step occurred in May 1972, when Mook and Dicke paid the balance of the purchase price pursuant to a similar letter of direction to the trustee denoting to whom disbursements were to be made. According to Pals, this letter did not denominate McNary as a payee because his interest was not to be disclosed to the public or the purchasers. Pursuant to McNary's instructions, Pals prepared and delivered to McNary a check in the amount of $12,472.94 payable to the First National Bank of Lansing, which McNary deposited in his B & M account.

On two occasions in 1973, McNary signed and filed a Statement of Economic Interests for the calendar year 1972. On neither of these statements did McNary disclose the third disbursement received during 1972 for the Salem Cross project, nor did his 1972 Federal Income Tax Return reflect the receipt of income from the sale of a capital asset. These two payments to McNary are charged as predicate offenses under Counts I and II in violation of the Illinois Bribery Statute.

*LANSING SQUARE*

In 1968, the property known as Lansing Square was vacant and adjacent to a landfill operation. In June 1968, Harry Rodenburg contracted to purchase Lansing Square from Joseph Menn for the purchase price of $200,000. The contract required a down payment of $20,000 with the balance to be paid within five years of the execution of the contract. Rodenburg approached McNary and offered him a fifty-percent interest in the transaction. McNary accepted and tendered $10,000 to Rodenburg which was used to satisfy a portion of the initial down payment. In late January or early February of 1969, a payment of principal and interest plus other costs was required. Rodenburg requested $18,200 from McNary as his share of the payments. Not having the funds available, McNary approached Pals and offered him one-half of McNary's interest in the property if Pals would advance the funds to McNary. Pals consulted his business associates, Herbert Pals, Judd Dalenburg and a Mr. Shackleton, Pals' salesman. They agreed to participate in the venture and Dalenburg advanced the $18,200 which was given to McNary by Pals. In return, McNary assigned to Pals, as trustee, one-half of his interest in the transaction. Pals did not disclose the Mayor's interest in the property to anyone.

After acquiring the Lansing Square property, Rodenburg applied to the Village for a rezoning from the single family classification to permit a multiple family development. On April 30, 1969, the ZBA recommended approval of the rezoning subject to the concurrence of the Plan Commission, but the Village Board never formally adopted an ordinance to rezone the property. In August 1970, Rodenburg, acting on behalf of the venture, contracted to sell the property to the Willowbrook Pasquinelli Construction Company for the erection of fifty-five apartment buildings. On April 3, 1973, the Chairman of the ZBA sent a letter to the Board indicating the concern of the ZBA about possible zoning violations at the Lansing Square construction site because, among other things, there appeared to be no ordinance rezoning the property to multi-family dwelling. At a Village Board meeting that evening, Trustee Klager brought the letter to the attention of the Board, which adopted his motion to order

cessation of construction at Lansing Square on any buildings that had not progressed beyond the foundation level until the situation had been clarified. Sometime prior to the next Board meeting, Klager discovered that construction had resumed on the buildings subject to the Board's order. During the May 1st Board meeting, Klager brought the matter of the resumed construction to the attention of the Village Board. Mayor McNary stated that he had investigated the matter and, satisfied that any questions had been resolved, had ordered the builders to proceed with construction. McNary made no specific responses to the ZBA letter of April 3rd, nor was an ordinance ever introduced to formally rezone the Lansing Square project.

The contract with Pasquinelli was subject to rezoning the property and was payable in three installments. The first occurred in January 1972; the second was in April 1973; and the third occurred in November 1973. The proceeds from the first and second closings were used by the venture to pay off the purchase price due to Menn and other loans acquired by them on account of the property. The proceeds of the third closing were used in part to repay the investors and constituted profit. The disbursement was made pursuant to a letter of direction which inadvertently contained the name of Jack McNary. Accordingly, McNary received a check payable to him in the amount of $15,989.38 which was credited against a B & M note at the First National Bank of Lansing. This income was not reported on McNary's 1973 Federal Income Tax Return or on his 1974 Statement of Economic Interest relating to calendar year 1973. Nor did McNary disclose his interest in the Lansing Square project to village officials. The receipt of this money is charged as a predicate offense under Counts I and II as a violation of the Illinois Bribery Statute.

*DEALERS TRANSIT*

In January 1970, Gerald Pals met with McNary to discuss a contract that had been entered into for the sale and exchange of certain property between the Dealers Transit Company, Commonwealth Edison, and others. The sale was contingent upon annexation of the property into the Village, zoning for manufacturing, and the extension of sewer and water lines to the property. Pals testified that McNary requested $10,000 if the annexation, zoning and extension of utilities occurred. Pals testified that, after conferring with his associates, he agreed to pay this amount.

On January 20, 1970 a Pre-annexation Zoning Agreement was executed by Mayor McNary and Chicago Title & Trust Company relative to the Dealers Transit property. On the same date, several village ordinances were enacted authorizing the Village to enter into the pre-annexation agreement, to annex the property, rezone the property, and to extend utilities pursuant to a recapture of cost agreement negotiated between Dealers Transit Company, Pals, and adjacent property owners.

The purchase money paid by Dealers Transit was escrowed in an account by Chicago Title & Trust. A disbursement check from this fund in the amount of $10,000 was received by Pals on February 27, 1970 and deposited into his own account. Pals then telephoned McNary to advise him that the Dealers Transit transaction was to be closed and to inquire of McNary what form of payment he required. McNary told Pals he wanted the payment in cash. On March 18, 1970, Pals prepared three separate checks in the amounts of $5,675.00, $3,750.00 and $575.00 made payable to the First National Bank in Dolton. Pals then met with Ed Robinson, an officer of the bank, who negotiated the checks and gave Pals $10,000 in cash. Immediately thereafter, Pals delivered the $10,000 to McNary at his office at B & M Manufacturing. McNary made cash deposits totalling $8,880.45 into his B & M account on three successive days as follows: March 19, 1970 —$3,000; March 20, 1970—$3,680.45; and March 21, 1970—$2,200.

*MARATHON*

In February 1970, Pals met with McNary to discuss an option contract Pals had arranged between Marathon Oil Company

and some property owners for the purchase of the property for use as a Marathon service station. Pals explained that the sale to Marathon was contingent upon a rezoning of the property to permit such use. Pals testified that McNary required $10,000 to obtain the zoning change and, after conferring with his partners, Pals telephoned McNary to advise him that they had agreed to pay the $10,000.

In July 1970, Quentin Wood, representing Marathon Oil, filed a request for a zoning change to permit service station use of the property. In September 1970, the ZBA, with Joseph Markby as Chairman, recommended denial of the request citing certain deficiencies. After the decision of the ZBA was rendered, Pals went to see McNary to discuss the Marathon rezoning. McNary advised Pals that he would handle the matter and that the ZBA would approve it.

In December 1970, Wood formally requested that the rezoning application be placed on the agenda of the Village Board. McNary instructed the Village Clerk to defer the request until it was decided to place the matter on the agenda. Subsequent to the April 1970 ZBA recommendation against rezoning of the Salem Cross apartment complex, McNary took steps to remove Joseph Markby as Chairman of the ZBA. By April 1971, Phillip Morris had become Chairman of the ZBA. The Marathon rezoning eventually came before the Village Board in February 1971. At that time the Board sent the matter back to the ZBA for reconsideration. On April 9, 1971, the ZBA, with a new chairman, reversed its prior decision and voted to recommend the rezoning. On April 23, 1971, the Village Board voted to accept the ZBA's recommendation. During the time the Marathon rezoning was before the Village officials McNary did not disclose his financial interest in the property.

In May 1971, Pals prepared a closing statement and a letter of direction for the Marathon transaction. Some days prior to the disbursement, Pals telephoned McNary to inform him of the closing and to determine how McNary wanted his funds disbursed. McNary directed Pals to prepare a check payable to the First National Bank of Lansing for $10,000. The check was thereafter delivered to McNary, who deposited it in his B & M account. This payment is alleged to be a predicate offense in violation of the Illinois Bribery Statute in Counts I and II of the indictment.

## OFFICE BUILDING

In January or February of 1971, this property was unimproved and located in the unincorporated area of Cook County. Pals testified that he and others owned the property and planned to develop it with an office building. In February 1971, Pals met with McNary to discuss the development with him and to explain that the property would require annexation and commercial use zoning. Pals further testified that McNary requested $4,000 in consideration for obtaining these requirements. Pals again conferred with his partners, and later reported to McNary that the money would be paid upon the annexation and rezoning. In July 1971, the Village Board, pursuant to McNary's recommendation, enacted an ordinance annexing and rezoning the Office Building property.

In September 1971, Pals telephoned McNary to inform him that he had obtained approval for the issuance of a $4,000 check. McNary instructed him to make it payable to the First National Bank of Lansing. A $4,000 check was drawn on an account maintained by the partnership, signed by the partners, and delivered to McNary by Pals at McNary's office. The two men then drove to the First National Bank of Lansing. At the bank, McNary instructed Pals to purchase two cashier's checks in the amount of $3,000 and $1,000 respectively with the $4,000 check. Pals purchased the two checks in his own name and then endorsed the $3,000 check and gave it to McNary. McNary instructed Pals to cash the $1,000 check and hold it for him. McNary deposited the $3,000 check in his personal account on September 27, 1971. In late December 1971, McNary telephoned Pals and requested the $1,000. Pals then met McNary and gave him the $1,000 in

cash at a restaurant in Lansing. These two payments are alleged to be predicate offenses in violation of the Illinois Bribery Statute in Counts I and II of the indictment.

### EXTORTION—SALEM CROSS

The foregoing has been a summary of the evidence regarding the five real estate transactions underlying the RICO counts. Count III of the indictment charged McNary with extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951. The evidence reflected three payments to McNary from Mook and/or Dicke over a period of time. In addition to forming the basis of Count III of the indictment, these payments are individually alleged to be predicate offenses under Counts I and II.

As noted above, Richard Mook and Gordon Dicke were the developers and general contractors of the Salem Cross apartment complex. Subsequent to the execution of the contract for the purchase of the property, Mook and Dicke solicited bids for various subcontracting jobs for the project. Window and door installation bids were among the subcontracted jobs solicited and three or four bids were received, including one from B & M Manufacturing Company. McNary's bid was $30,000 to $50,000 higher than the other bids and was rejected for that reason.

As a condition precedent to the obtaining of financing for the project, Mook and Dicke were required to demonstrate that they had been issued building permits. On March 25, 1971, Mook and Dicke submitted an application for the permits and paid a $21,864 application fee to the Village. Thereafter, Mook and Dicke became concerned about their rejection of the B & M Manufacturing bid and contacted Pals. Pals testified that he told them he knew nothing about the bid rejection but would confer with McNary that evening. The next morning, Pals spoke with Dicke and told him that if he and Mook would pay McNary $20,000, they could purchase the windows from anyone they wanted.

Mook and Dicke agreed to the payment, but testified that because of a cash problem the $20,000 was not available and in their concern, they met with McNary in early April 1971. They further testified that the Mayor told them to work it out with Pals. After the meeting, McNary telephoned Pals to tell him that Mook and Dicke had agreed to the payment, but that they would not have the money until they obtained financing, which was contingent upon receiving the building permits. McNary instructed Pals to prepare some kind of agreement which would assure payment of the $20,000. Thereafter Mook and Dicke met with Pals and signed two promissory notes totalling $20,000 and payable to Pals.

The building permit application for Salem Cross was approved on April 22, 1971, and the developers subsequently obtained financing for the project. On July 14, 1971, Mook prepared a check payable to Gerald Pals and the First National Bank of Lansing for $10,000. Mook spoke with Pals about the check and Pals instructed Mook not to make it out to him, but to make it payable to B & M Manufacturing in an uneven amount so that it would not appear to be a payoff. The next day, after discussing the Pals' conversation with Dicke, Mook prepared a second check in the amount of $10,010.98 payable to B & M Manufacturing Company and delivered the check to McNary. On June 2, 1972, Dicke prepared a $5,000 check payable to B & M and delivered it to McNary. McNary expressed concern about the remaining $5,000 and Dicke assured him he would receive it. In November 1972, Mook suggested to Dicke that they refuse to make the last $5,000 payment. Dicke told Mook that problems might arise with the Village if the money was not paid because they had not yet obtained occupancy permits for the project. Mook agreed to the payment and on November 15, 1972, Dicke prepared a $5,000 check payable to B & M which was either mailed or delivered to McNary. Both Mook and Dicke testified that the reason they paid the sum of $20,010.98 to McNary was because of his position as Mayor of the Village of Lansing.

## II

Count II of the indictment charged the appellant with investing the income or proceeds from a pattern of racketeering activity into Ports of Call, an enterprise engaged in or affecting interstate commerce. McNary contends on appeal that the conviction on Count II should be reversed because the evidence at trial failed to establish that any of the racketeering income was deposited directly into Ports of Call.[8] We find the arguments advanced in support of this contention to be without merit.

The indictment charged and the evidence showed that between March 1970 and November 1973, the appellant received over $85,000 derived from a pattern of racketeering activity. The appellant admitted that during this period more than $65,000 of this amount was deposited directly into his B & M Manufacturing Company account or otherwise used to assist that business.[9] The remaining $20,000 was either deposited in his personal bank account or simply retained by him. The appellant also admitted that between September 27, 1971 and October 6, 1973, he transferred in excess of $103,000 from his B & M account to his Ports of Call account.

The Government acknowledges on appeal, as it did at trial, that there was no evidence that McNary immediately or directly deposited any of the income derived from his pattern of racketeering into Ports of Call. However, it is the Government's position that the commingling of the illicit income received by the appellant with whatever legitimate funds B & M possessed and the subsequent investment of these combined assets into Ports of Call constituted the use or investment of the income, or proceeds of the income, derived from a pattern of racketeering activity in violation of Section 1962(a) of the RICO Act. We agree.

 Section 1962(a) of the RICO Act provides, in pertinent part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). We find the statutory language "directly or indirectly" to be significant in the context of its application to this case. These words demonstrate that the statute contemplates situations in which racketeering monies will not be directly or immediately employed to establish or operate interstate enterprise. Thus, the statute on its face does not require immediate or even direct use of illicit income to establish a violation of its terms. Nor does it even require that the actual illicit income itself be used or invested in an enterprise affecting interstate commerce; the statute is satisfied if the proceeds from such income are so used or invested. To require, as the appellant argues, that the evidence show a direct employment of illicit income is to ignore the clear proscription of the statute and, as a practical matter, would render the statute ineffective against the use of interim depositories, commingled funds, and other surreptitious accounting techniques designed to create significant obstacles to the tracing of illicit income. Such an analysis is contrary to the plain meaning of the statute and inconsistent with the liberal purpose of the RICO Act. *See United States v. Kaye*, 556 F.2d 855, 860, n.7 (7th Cir.), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). We therefore hold

---

8. The appellant stipulated at trial that Ports of Call was an enterprise affecting interstate commerce, and for purposes of this argument does not contest that the monies he received were derived from a pattern of racketeering activity.

9. The $15,989.98 received by McNary from the Lansing Square project was credited to an outstanding company loan at the First National Bank of Lansing.

that evidence of indirect investment of the proceeds of racketeering activity into an enterprise affecting interstate commerce is sufficient to establish a violation of Section 1962(a).

While neither the appellant nor the government cites any authority directly on point with this case, we find an analogous situation addressed by the Second Circuit to be persuasive. In *United States v. Parness*, 503 F.2d 430, 435–437 (2d Cir. 1974), *cert. denied*, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1975), the defendant was charged with a violation of Section 1962(b) of the RICO Act—acquiring an interstate enterprise through a pattern of racketeering activity or collection of unlawful debts. The court rejected the defendant's argument that the failure of the government to trace the proceeds of particular gambling debts to the defendant's corporation and then to an enterprise he acquired was fatal. The court noted that an absence of specific tracing was not surprising given the nature of the activity involved, but was satisfied that a sufficient nexus existed between the illicit money and the acquisition.

Such a nexus was present in this case. The jury, in examining the evidence of the appellant's investment in Ports of Call, had before it the fact that McNary made transfers exceeding $103,000 to that entity from his B & M Manufacturing Company account. It is clear that McNary's pattern of racketeering allowed or facilitated these investments because the receipt of over $65,000 in racketeering income invested in B & M permitted him to make an equivalent investment in Ports of Call. The appellant was thus able to effect more than one-half of his investment in Ports of Call without any depletion of B & M's legitimate assets. Whether McNary's investment in Ports of Call is termed as "indirect" use or investment of racketeering income, or the use or investment of the "proceeds of such income," it is nonetheless the very activity proscribed by the statute. We therefore conclude that sufficient evidence was adduced at trial to sustain the jury's verdict on Count II of the indictment.

The judgment of conviction appealed from is affirmed, and the Clerk of this Court is directed to enter judgment accordingly.

AFFIRMED.