**UNITED STATES of America**

v.

**David Jack VOGT, Jr.**

**No. Cr–86–199–01–G.**

United States District Court, M.D. North Carolina, Greensboro Division.

Dec. 24, 1987.

Harry M. Solomon, Miami, Fla., Donald T. Bogan, Greensboro, N.C., Joel Hirschhorn, Miami, Fla., for defendant.

## MEMORANDUM OPINION

BULLOCK, District Judge.

Defendant David Jack Vogt, Jr., was charged in the first three counts of a four-count superseding indictment handed down on January 5, 1987, which also named Burton Robert Levey and William Carl Ray as defendants. Count One alleged that Vogt violated 18 U.S.C. § 1962(a) by knowingly and willfully investing or using income or proceeds derived directly or indirectly from a pattern of racketeering activity in an enterprise engaged in or affecting interstate commerce. The predicate racketeering activity alleged was multiple violations of 18 U.S.C. § 201(c)(3), to wit, knowingly, intentionally and corruptly receiving and agreeing to receive things of value in return for doing or omitting to do acts in violation of his official duty as an officer of the United States Customs Service. Count Two alleged that Vogt conspired with Levey and Ray to violate 18 U.S.C. § 1962(a). Count Three alleged that Vogt conspired with Levey, Ray, *and others* to violate 18 U.S.C. § 371 by "impeding, impairing, obstructing and defeating the lawful functions" of the Internal Revenue Service in ascertaining, computing, assessing and collecting federal income taxes.

The indictment also alleged that by virtue of violating Section 1962 Vogt and Ray were subject to the criminal forfeiture provisions of 18 U.S.C. § 1963(a)(1), (2), and (3), and described several items allegedly forfeitable.

The evidence presented by the government in the case, consistent with its theory of prosecution, established that Defendant Vogt, after accepting bribe money from drug smugglers in exchange for confidential customs service information, concealed this money through the use of off-shore accounts, domestic and off-shore corporations, and the utilization of the law firm trust accounts of his Florida and North Carolina attorneys, co-defendants Levey and Ray, and invested the money in acquiring assets in Florida, North Carolina, and elsewhere. After a trial which continued for almost three months, the jury re-

turned a verdict on June 18, 1987, finding Vogt guilty of Counts One and Three. The jury acquitted Vogt on Count Two and acquitted Levey and Ray on all applicable counts.

Having been convicted of violating Section 1962 Vogt is subject to the criminal forfeiture provisions of Section 1963(a). Vogt knowingly and voluntarily agreed to a bench trial on the forfeiture issue, thereby waiving his right to a jury determination under Rule 31(e) of the Federal Rules of Criminal Procedure. Vogt has been awaiting sentence pending the court's determinations as to forfeiture.

Defendant requested that the court make specific findings of fact on the forfeiture issue. Based on the evidence produced at trial the court deems the findings of fact set out below to have been established by proof beyond a reasonable doubt. In any trial of this length, however, involving ninety witnesses and approximately 500 exhibits, it is not possible to enumerate every shred of evidence supporting each finding; the court, in making references to specific evidence supporting the findings below, does not suggest that the evidence enumerated is exclusive, and that there are not additional facts and circumstances leading to the same finding or conclusion.

## FINDINGS OF FACT

### I. *Background*

#### A. The Bribes

1. From 1971 to early 1979 Defendant David Jack Vogt, Jr., was employed by the United States Department of the Treasury as a customs official for the United States Customs Service in the south Florida area.

2. Defendant first met Philip Frederick Keidaish in May 1974 when Defendant arrested Keidaish on a sojourn violation for illegally taking an ex-military aircraft out of the country.

3. Beginning sometime after the sojourn arrest in 1974 Keidaish and Vogt became friends, during a time when Keidaish was involved in an extensive smuggling operation involving numerous flights bringing multiple ton loads of marijuana into the United States from South America.

4. Beginning sometime after the sojourn arrest in 1974 and continuing until late 1978 Keidaish made cash payments to Vogt in United States currency approximately seven times, averaging in excess of $100,000.00, in exchange for information from Vogt pertaining to Customs Service surveillance and "watch lists" of suspected drug smugglers.

5. Keidaish and his associates, including Theodore DeLisi, his partner in several smuggling flights, used the information Defendant provided in making their arrangements to import marijuana from South America by plane, and at least twice relied on Defendant's information in changing plans.

6. Keidaish testified credibly about the smuggling operation, his leadership role in it, and his bribery of Vogt. The court credits Keidaish's testimony, and when considered along with that of Theodore DeLisi, James Wilson, Harry Hill, James DeVon, and others, finds that it establishes beyond a reasonable doubt that Vogt received substantial cash bribes from the Keidaish smuggling organization in exchange for supplying confidential information to Keidaish.

#### B. Tracing the Racketeering Income— Defendant's Use of Off–Shore Accounts and Attorneys' Trust Accounts

1. Burton R. Levey was and is an attorney in Miami, Florida, and during the 1970's and early 1980's was a partner with Leonard Levenstein and others in the four-to-six-person law firm of Levey, Levenstein, Cowan & Rubenstein. Levey represented Philip Keidaish in a variety of legal matters during the 1970's, and incorporated several off-shore corporations in the islands for Keidaish. Levey represented Keidaish in purchases of assets through off-shore corporations including land in Polk County, Florida, purchased in the name of a Netherlands Antilles corporation, Worthington, N.V. Keidaish also owned airplanes which he held in corporate

names. Keidaish did not hold assets in his own name because he did not want to report assets in excess of his income to the Internal Revenue Service, and thus presented himself as an "agent" of certain corporations rather than as the owner. Keidaish laundered money through off-shore bank accounts and the Levey law firm trust account in an attempt to hide assets derived from illicit income.

2. Leonard Levenstein did a substantial amount of corporate work through off-shore corporations and banks for Theodore DeLisi, Keidaish's partner in some of his smuggling operations. Levenstein personally took illegal money, accompanied by Levey on at least one occasion, to the Bank of Nova Scotia in Freeport, Bahamas, for Theodore DeLisi. The law firm often wire transferred funds from the Bank of Nova Scotia back into the firm trust account. Substantial illegal income passed through the Bank of Nova Scotia and into the Levey, Levenstein firm trust accounts.

3. The Levey, Levenstein, Cowan, Rubenstein firm trust account was with Pan American Bank of Miami during at least the second half of 1979 until at least through March 1980. By May of 1980 and continuing through at least August 1981 the firm trust account was with First City Bank of Dade County, Florida.

4. Keidaish introduced Vogt to Levey in March 1979 with respect to a problem Defendant had with title to an airplane. Beginning on March 21, 1979, and continuing at least through April 23, 1980, Levey performed a variety of legal work for the Defendant. While there is no evidence that Levey directly established off-shore corporations and accounts for Vogt, Levey assisted Vogt in transactions involving such off-shore corporations and accounts.

5. Darryl Myers is an attorney in Grand Cayman, British West Indies, and the evidence presented at trial established beyond a reasonable doubt that Darryl Myers was an unindicted co-conspirator in many of the money-laundering activities alleged in the indictment. The trust account for Myers' law firm, McDonald, Myers & Co., was with the Bank of Nova Scotia in the Cayman Islands. Keidaish and Vogt were acquainted with Myers.

6. Vogt spoke on numerous occasions about off-shore corporations, about doing consulting work for off-shore corporations, and about putting money into off-shore corporations and bringing it back into the country later. In January 1981 Vogt, Keidaish, Ray Pringle, Jr., and James E. Hodges went to the Cayman Islands, where they went to the Bank of Nova Scotia and Keidaish and Vogt met with officers of the bank from 30 to 45 minutes. Keidaish and Vogt also met with Myers in the Caymans on at least one other occasion. Defendant was also in the Caymans from July 14–July 17, 1977, on vacation from his position with the Customs Service.

7. From January 31, 1980, through December 19, 1980, Mary Anne Vogt, wife of Defendant, received cashier's checks from the Bank of Nova Scotia, Georgetown, Grand Cayman, Cayman Islands, B.W.I., on a monthly basis, all in the amount of $3,000.00, and deposited each in the joint personal bank account held by her and Defendant.

8. Guiness Mahon Bank is a Cayman Island bank. Mary Anne Vogt received checks dated November 26, 1981, and November 27, 1981, drawn on the Guiness Mahon Cayman Trust Limited account through Irving Trust in New York for $4,000.00 each, which she deposited on separate days in the Vogt joint personal account.

9. Defendant received two checks from the Guiness Mahon Cayman Trust Limited account through Irving Trust dated July 23, 1981, both in the amount of $4,000.00, and three checks from the same account dated February 2, 1982, all for $4,000.00, all of which he deposited separately in the joint personal account.

10. Defendant received a check from the Guiness Mahon Cayman Trust Limited account through Irving Trust dated October 27, 1981, and one dated January 14, 1983, both for $4,500.00, and deposited each in the joint personal account.

11. Defendant was familiar with the regulations promulgated under the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5313, 31 C.F.R. §§ 103.22, 103.23, concerning cash transactions or transportation of cash or monetary instruments.

12. The name James M. Owens was an alias used by Vogt. In July 1982 Vogt, as James Owens, endorsed and cashed a check dated July 14, 1982, made out to "cash" in the amount of $50,000.00 drawn on the Guiness Mahon Cayman Trust Limited account through Irving Trust Company.

13. William Carl Ray, a co-defendant in this case, was and is an attorney in Greensboro, North Carolina. The trust account for his law firm, Walker, Dowda, Ray & Warren, was with Wachovia Bank & Trust Company, N.A., in 1980 and continuing at least through 1982. From no later than January 1981 until at least March 1983 Ray represented Vogt and corporations with which Vogt was affiliated in several matters.

14. William Carl Ray's uncle, Herb Robinson, resides in El Paso, Texas. On September 3, 1982, Vogt, using the James Owens alias, took delivery of a 1982 34–foot Airstream trailer, purchased for $40,856.50 from Land Yacht Trailer Sales in El Paso, Texas. Land Yacht Trailer Sales would also hold mail for Vogt ("Owens") which would be picked up periodically for Defendant by Herb Robinson.

15. The bulk of the purchase price for the trailer was paid by check dated August 2, 1982, drawn on the Guiness Mahon Cayman Trust account through Irving Trust, to Land Yacht Trailer Sales in the amount of $40,000.00, which check was sent by the MacDonald, Myers & Company law firm.

16. The Airstream trailer was sold on November 9, 1984, through Land Yacht Trailer Sales to Harrison King, and Defendant received a total of $32,000.00. Defendant received partial cash payments from Land Yacht in increments of less than $10,000.00 on January 21, 22, 23, 24, and February 5 and 8, 1985. When deposited, these cash payments of less than $10,000.00 did not require the bank to report them under the Currency Transactions Act.

C. The Colonial Manor Apartments

1. In July 1978 Defendant and his wife, represented by their friend Marshall Nance, were introduced to Harvey G. Mitchell, Jr., a motor vehicle dealer, and the owner of the Colonial Manor Apartments in Greensboro, North Carolina. Nance was also a close friend of Mitchell, and had in fact been more like Mitchell's stepbrother, Nance's father having reared Mitchell in the Nance home during his teenage years. Nance knew that Mitchell was looking for a buyer for the apartments, and that the Vogts were interested in such a purchase.

2. In November 1978 the Vogts agreed to purchase Colonial Manor from Harvey Mitchell for a tentative total price of $797,-253.36. This price included intended assumption of the first deed of trust held by Aetna Life Insurance Company in the amount of $607,659.58, and a second deed of trust held by Planter's Bank in an approximate amount of $165,000.00. Planter's Bank held second and third mortgages on Colonial Manor which were in default and were in the process of being foreclosed at the time of the purchase.

3. Mitchell personally received approximately $25,000.00 from the Vogts from their legitimate assets, and another $100,-000.00 in cash "under the table" for Colonial Manor. In crediting Mitchell's testimony concerning the $100,000.00 under-the-table payment, the court finds it entirely consistent with Mitchell's well-established method of doing business throughout his business career, a career typified by tax evasion and falsified financial reporting.

4. Planter's second mortgage totaling $178,418.83 including principal, interest, and collection expenses was paid off on January 15, 1979, by a check in the amount of $174,104.18 dated January 11, 1979, from Chardon, N.V., a Netherlands Antilles corporation represented by Darryl Myers, drawn on the Bank of Nova Scotia in the Cayman Islands, and $4,314.65 in cash paid by Defendant.

5. Defendant "borrowed" the $174,104.18 from Chardon, N.V., and represented Chardon in the transaction with Planter's Bank.

6. Defendant refused to supply Aetna Life Insurance Company or Wachovia Bank & Trust Company with personal financial statements, and therefore never technically assumed the first deed of trust; however, Defendant made the regular monthly payments and thus avoided foreclosure.

7. From March 20, 1979, to August 26, 1980, Defendant's wife wrote out monthly checks to Chardon, N.V., in the amount of $2,411.50, drawn on the Colonial Manor account with First Citizen's Bank.

8. Monthly rental income from the Colonial Manor Apartments averaged between $9,000.00 and $17,000.00. Defendant reported rental income for December 1978 of $9,275.00 and expenses other than depreciation of $12,064.00 for a loss of $2,789.00.

9. Defendant paid the manager of Colonial Manor a monthly fee of $600.00 from January of 1979 through February 1980, and $700.00 from March 1980 through September 1980 by checks drawn on the Colonial Manor account.

10. Defendant spent large sums of money fixing up the apartments. From February 19, 1979, to August 13, 1980, Defendant wrote checks on the Colonial Manor account for maintenance totaling at least $35,850.00.

11. In 1979 Defendant reported a loss for rents, etc., which, excluding straight line depreciation, totaled $5,110.00. In 1980 Colonial Manor rents less expenses, excluding depreciation, totaled $16,305.00.

12. Even if the Colonial Manor rents covered expenses, they provided little additional income to the Vogts. Defendant's legitimate funds were very limited during the time period, and some of the money he spent on Colonial Manor apartments was derived from the bribes paid by Keidaish.

13. Evidence of Defendant's access to funds is the purchase of Philip Keidaish's lavish house in Ft. Lauderdale, Florida, on August 1, 1980, by Mary Anne Vogt, financed ostensibly with approximately $60,000.00 from the sale of the Vogts' modest residence and a $124,000.00 purchase money mortgage payable to Mrs. Keidaish. The court credits Philip Keidaish's testimony that he sold his home to the Vogts for approximately $200,000.00 to obtain quick cash for his $180,000.00 bail. Further evidence of Defendant's access to funds before his resale of Colonial Manor is established by his purchase of a 1980 Cadillac from Harvey Mitchell on March 21, 1980, for which he paid $13,283.48 cash. In neither of these transactions was a corporate shield used.

14. On November 13, 1980, Defendant and his wife sold the Colonial Manor Apartments to Carolina Landmark Corporation for $1,425,000.00. Chardon, N.V., through Darryl Myers, was paid $158,524.34, extinguishing the second deed of trust, which money went into Myers' firm trust account. Aetna received $563,077.00, including the prepayment penalty in satisfaction of the first deed of trust. The Vogts received a check in the amount of $652,964.05, dated November 13, 1980.

15. After the sale of Colonial Manor, the Vogts had reported income from bank accounts and dividends ranging from $64,868.00 in 1981 to $25,713.00 in 1983, indicating substantial savings and investments. From 1981 to 1983 most of the interest income reported to the IRS was in "island accounts."

## II. *The Enterprises*

### A. Chardon, N.V.

1. Chardon, N.V., is a Netherlands Antilles corporation and was at times a client of Burton Levey's law firm. Defendant had substantial interaction with Chardon, N.V., but it is not established beyond a reasonable doubt that Defendant invested or used his racketeering income in or through Chardon.

2. Defendant financed a substantial portion of the purchase price of the Colonial Manor Apartments with a January 1979 "loan" from Chardon, N.V., a Netherlands Antilles corporation represented by Darryl

Myers and for whom Defendant was allegedly an agent, as set out above.

3. On August 1, 1979, Chardon, represented by Levey and by Defendant as "loan officer," lent $50,000.00 to Harvey Mitchell which loan was secured by a second mortgage on Mitchell's residence on Groometown Road in Greensboro, North Carolina. Chardon did not require Mitchell to fill out an application for the loan, nor to submit financial information.

4. A check in the amount of $50,000.00, made out to Mitchell, dated July 10, 1979, and drawn on the Bank of Nova Scotia was endorsed to and deposited in the Levey firm trust account. The loan proceeds passed by a check dated August 8, 1979, in the amount of $48,531.00 drawn on Levey's firm trust account with Pan American Bank. The endorsement in the name of Harvey Mitchell on the Bank of Nova Scotia check was not written by Mitchell.

5. In September 1979 Mitchell negotiated through Defendant for a loan from Chardon in the amount of $310,000.00, which Mitchell was to use to purchase what ultimately became Mitchell Olds–Cadillac, Inc., in Burlington, North Carolina. The promissory note was to be secured by a second lien on the Groometown Road property, and the loan was to close by November 15, 1979. Defendant and Mitchell entered into a collateral agreement by which Defendant would retain ten per cent (10%) of the stock of the dealership as a "finder's fee."

6. At closing, Defendant and Levey demanded that Mitchell take out a $500,000.00 "key man" life insurance policy, to which Defendant personally was to be the beneficiary. Mitchell and his attorney refused this request and the loan was not finalized.

7. Levey's law firm client file for Vogt includes an entry for the $50,000.00 Chardon loan to Mitchell for the Groometown Road property, and for the proposed $310,000.00 loan for the Olds–Cadillac agency.

B. Real Tech International Ltd.

1. Real Tech International Ltd. is a Cayman Island corporation engaged in interstate commerce, and was a client of Burton Levey's law firm. It is established by proof beyond a reasonable doubt that Defendant Vogt was the actual owner of Real Tech International Ltd. and put funds derived from his racketeering activity into the corporation.

2. Defendant used Real Tech International Ltd. to buy assets for his own use or for investment purposes, including Harvey Mitchell's Groometown Road residence in Greensboro, two Mercedes automobiles, and a Sea–Ray boat.

3. As originally negotiated, Real Tech was to be the lender of the $50,000.00 to Harvey Mitchell on the Groometown Road property. Also, a check in the amount of $350,000.00 dated November 19, 1979, a few days after the proposed $310,000.00 loan to Mitchell fell through, drawn on the Levey firm trust account, named Real Tech as payee and was endorsed for Real Tech by Darryl Myers.

4. The evidence established that on November 7, 1979, Mitchell sold his residence on Groometown Road in Greensboro, North Carolina, to Real Tech International Ltd., controlled by the Defendant, for approximately $172,170.00. Mitchell advised his attorney that the sale price was only $130,000.00.

5. Mitchell received a check in the amount of $5,878.21 drawn on the Levey law firm trust account and Real Tech assumed the existing deed of trust and the second mortgage held by Chardon, N.V.

6. Mitchell continued to live in the house until 1982. On April 7, 1981, Mitchell entered into an agreement with Defendant under which Mitchell had a one-year option to repurchase the Groometown Road property. Defendant signed the agreement in his own name, not as a representative of Real Tech. The terms of the option included paying Defendant extra interest and required Defendant to pay the taxes and insurance.

7. Levey's client file for Defendant includes purchase of the Groometown Road property by Real Tech. Insurance on the property remained in Mitchell's name until

1981, but from March 24, 1981, to February 28, 1983, the house was insured in the name of Real Tech in care of William Ray, but the policy was taken out by Defendant and was listed by the insurance carrier under Defendant's name. The personal umbrella policy taken out in the name of Mary Anne Vogt through William Ray for the period September 8, 1981, to September 8, 1983, included mention of a residence in Greensboro, North Carolina.

8. Additional evidence of Defendant's personal ownership of the Groometown Road property is the credible testimony of William Snouffer that Defendant offered to sell the property to him for $180,000.00 cash. In December 1981 Darryl Myers, signing as president of Real Tech, gave William Ray legal power of attorney to sell the Groometown Road property. On December 21, 1982, Real Tech passed a corporate resolution to sell the property. In early 1983 the property was sold in a sham transaction to Defendant's parents for $55,000.00 and assumption of a deed of trust in the amount of $72,170.96 in favor of the Federal Land Bank of Columbia, said loan still being in the name of Harvey Mitchell.

9. Defendant also purchased two Mercedes for the use of his wife and himself in the name of Real Tech with illicit income. Defendant and his wife were the true owners of the vehicles.

10. On February 8, 1980, Harvey Mitchell, through his dealership Burlington Dodge, sold a 1979 Mercedes 450 SEL to Real Tech International for $29,800.00 (excluding tax). This vehicle was ordered by Vogt in October 1979, paid for in November 1979, and kept at Mitchell's Groometown Road property from October 1979 to February 1980, when it was titled to Real Tech at Vogt's direction. A North Carolina title for the vehicle was applied for on February 8, 1980, in Defendant's name as president of Real Tech.

11. On February 18, 1980, Mitchell, through Mitchell Olds–Cadillac acquired a 1980 Mercedes 450 SL upon Defendant's request for his wife for $33,543.00 and titled it to Real Tech International. Defendant's name and telephone number were on the purchase order, and on February 19, 1980, Defendant applied for a North Carolina title for the vehicles signing as agent of Real Tech. Both vehicles had been prepaid by Defendant through a check dated November 6, 1979, on Burton Levey's firm trust account in the amount of $115,232.20, which also represented an additional payment for the Groometown Road property.

12. Both Mercedes were insured by Penn General under a policy originally listed in the name of Defendant for Real Tech and later changed to Real Tech in care of Levey. The only drivers listed on the policy were Defendant and his wife. Philip Keidaish testified that the Defendant admitted the cars were his, but stated that he had concealed the true ownership to avoid the "high profile" about which Keidaish expressed concern.

13. On November 24, 1980, Real Tech "sold" the two Mercedes to Mary Anne Vogt for $22,000.00 and $28,000.00 for the SEL and SL respectively. She paid Real Tech by checks drawn on the Vogts' joint personal account with Gulf Stream Bank, which were endorsed to McDonald Myers & Co. by Darryl Myers signing for Real Tech. These "purchases" by Defendant's wife were in effect paper transactions.

14. On January 18, 1980, Real Tech International ordered, and on February 6, 1980, purchased, a 1980 Sea Ray motorboat for $63,232.00 from Uphoff Marine Sales.

15. The purchase was financed with money drawn from the Levey law firm trust account with Defendant signing as agent for Real Tech. Defendant was in fact the owner of the boat and the purchase was made with money derived from Defendant's racketeering activities.

16. Levey's client file for Defendant includes an entry for Real Tech's purchase of the boat, and Levey applied for a Florida title in the name of Real Tech. Repair orders from Uphoff Marine Sales list Defendant as the customer. Mary Anne Vogt's umbrella policy includes a listing of the Sea Ray under Real Tech.

17. Defendant at various times took friends out on the boat, and Rick Steelman

testified credibly that in August 1980 he saw the boat at Defendant's residence. Steelman also testified that during the summer of 1982 William Ray mentioned the prospect of selling the Sea Ray to him, saying that Vogt needed money or would lose his assets.

18. As a director of Real Tech, Darryl Myers gave Ray power of attorney over the Sea Ray. On August 16, 1982, Real Tech through Ray transferred the boat to Arthur Campagna.

C. Silver Realty Corporation

1. Silver Realty Corporation was a North Carolina corporation formed on May 17, 1979, by Burton Levey and Prentice–Hall, Inc., and engaged in interstate commerce. Silver Realty was to have been called Real Tech of North Carolina, but the name Real Tech was not available in North Carolina. Silver Realty Corporation was a North Carolina subsidiary of Real Tech International.

2. Silver Realty Corporation was owned and controlled by Defendant and Defendant put funds derived from racketeering activity into the corporation. Silver Realty was a client of Burton Levey's law firm. Defendant obtained a lock box as agent for Silver Realty in Greensboro for the period August 23, 1979, to September 1, 1981. On December 3, 1980, insurance coverage for the two Mercedes was changed from Real Tech's policy to a policy in the name of Silver Realty. In notes to Mary Anne Vogt's umbrella policy, Silver Realty is listed as being owned by Real Tech.

3. In July 1978 Defendant told Harvey Mitchell he would like to have an FMC motor home. Mitchell located the motor home in Wisconsin, and Defendant and his wife flew to Greensboro, North Carolina, from Florida with $32,000.00 in cash to purchase it.

4. Mitchell originally titled the FMC to Burlington Leasing Company, and then on September 22, 1978, to Burlington Dodge (both owned by him) at Defendant's direction.

5. Defendant was the actual purchaser and owner of the FMC motor home and purchased it with funds derived from his racketeering activity. Silver Realty was created in part to hold title to the FMC for Defendant. Insurance on the FMC through Penn General agencies was in Defendant's name in June 1979 and Defendant and his wife were listed as drivers. Defendant obtained the vehicle for his personal use, and at least on one occasion in May 1979 drove it to the Colonial Manor Apartments.

6. In 1979 Defendant advised Harvey Mitchell that he wanted a tow vehicle to use with the FMC motor home, and on June 7, 1979, Burlington Dodge, Inc., which Mitchell owned, sold a 1979 Jeep CJ7 to Silver Realty. Defendant paid the purchase price in cash on June 7, 1979, and applied for a North Carolina title on behalf of Silver Realty. This vehicle was owned by the Defendant and was purchased with funds derived from Defendant's racketeering activity.

7. The 1979 Jeep was damaged when it became separated from the FMC while the Vogts, Harvey Mitchell, and Marshall Nance were on the way to the North Carolina coast. On October 4, 1979, Defendant transferred the damaged Jeep back to Burlington Dodge, in exchange for a 1980 Dodge Omni. The Omni was delivered and titled to Marshall Nance at Defendant's instructions. Silver Realty did not receive anything in exchange for the 1979 Jeep.

8. On February 8, 1980, Silver Realty purchased a 1980 Jeep CJ7 from Burlington Dodge for $8,247.20 (excluding tax). Defendant picked up the Jeep and instructed Mitchell to bill it to Silver Realty. This vehicle also belonged to the Defendant, not as agent for Silver Realty but personally, and its purchase represented a use or investment of income derived from his racketeering activity.

9. North Carolina title for the 1980 Jeep was applied for on February 8, 1980, with Defendant's name signed as president of Real Tech. Defendant at various times was seen driving the FMC with the Jeep behind it. Invoices for Silver Realty's insurance policy and for Real Tech's policy

went to Burton Levey, and were listed under Defendant's name.

10. On March 18, 1981, Silver Realty transferred title to the FMC and the 1980 Jeep to Hicone Motors, with Defendant's name signed for Silver Realty. Hicone Motors is a used car dealership in Greensboro operated by Robert C. Robinson, a cousin of William C. Ray.

11. Also on March 18, 1981, Hicone Motors transferred the FMC and the 1980 Jeep to William C. Ray for $12,330.00 and $4,500.00 respectively. Robinson did not participate in the transfers and did not pay or receive any money in any of the transactions, and Ray signed Robinson's name. Ray used the Knoxville, Tennessee, address of an apartment he had rented and titled the vehicles in Tennessee.

12. The sales to and purchases from Hicone Motors were paper transactions intended to clear title to the vehicles.

13. On August 24, 1981, Ray assigned title to the FMC to Mitchell Olds–Cadillac. On October 29, 1981, Mitchell Olds–Cadillac sold the FMC to Charles Green of Virginia Beach, Virginia, for $33,000.00.

D. Costalotta, Inc.

1. Costalotta, Inc., is a North Carolina corporation engaged in interstate commerce formed on July 30, 1981, by one of William C. Ray's law partners at his request. Ray was listed as and signed as president of Costalotta.

2. Defendant owns Costalotta, Inc., and used or invested funds derived from his racketeering in or through Costalotta, Inc.

3. On August 24, 1981, William C. Ray sold the 1980 Jeep CJ7, previously transferred from Silver Realty to Hicone Motors to Ray, to Costalotta, Inc., for $5,600.00.

4. The 1980 Jeep was purchased by Defendant for his personal use. Ben David Smith, a flight instructor, testified credibly that Mary Anne Vogt picked him up, along with the Defendant, at the Ft. Lauderdale, Florida, airport in the Jeep. Defendant, using his "James Owens" alias, also used the Jeep to pass the driver's test for a Tennessee license on January 29, 1982.

5. On July 19, 1982, William C. Ray repurchased the 1980 Jeep from Costalotta.

6. In mid-July 1981 Defendant ordered a 1981 Bluebird Wanderlodge Motor Home from Mitchell Olds–Cadillac. Down payment was made by check in the amount of $20,000.00 dated July 23, 1981, and drawn on the Guiness Mahon Cayman Trust Limited account through Irving Trust.

7. At the instructions of William C. Ray, Harvey Mitchell crossed out Defendant's name on the receipt and replaced it with Costalotta, Inc., which was not chartered until a week later.

8. The Bluebird was purchased and owned by Defendant for his own use, with funds derived either directly from his illegal activity, indirectly through funds generated from the sale of Colonial Manor Apartments, or both.

9. On December 10, 1981, Mitchell formally purchased the Bluebird to sell to Defendant and put Defendant's name on his bookkeeping entry. On December 23, 1981, Costalotta purchased the 1981 Bluebird for a total price of $206,121.80, including the previous $20,000.00 down payment, and the receipt was made out to Costalotta and the Defendant.

10. Mitchell received the remaining $186,000.00 by a check dated December 7, 1981, drawn on the Bank of Nova Scotia in the Cayman Islands, and deposited it on December 15, 1981.

11. William C. Ray applied for a North Carolina title for the Bluebird, signing as president of Costalotta.

12. Defendant and his wife made extensive use of the Bluebird, including stays at campgrounds in Tennessee and in El Paso, Texas, in 1982.

13. At Defendant's request, Harvey Mitchell ordered a new mobile telephone for the Bluebird on March 9, 1982, and Defendant signed his own name as customer.

14. On the Penn General insurance policy which covered the Bluebird and the 1980 Jeep in the name of Costalotta, the two Vogts were listed as the only drivers. The

Bluebird was added to Costalotta's insurance policy on December 18, 1981, and Penn General cancelled the insurance as to the Bluebird at Defendant's written request on July 13, 1982, after Defendant informed the carrier that the Bluebird had been sold.

15. In June 1982 Defendant asked Mitchell to repurchase the Bluebird.

16. On July 1, 1982, William C. Ray as president of Costalotta assigned title back to Mitchell Olds–Cadillac.

17. On July 2, 1982, Harvey Mitchell drove to a campground in Georgia where he met the Vogts and Ray and gave Vogt a cashier's check in the amount of $185,000.00 made out to Costalotta.

18. The cashier's check was assigned by special endorsement from Ray as president of Costalotta to Real Tech and was deposited in the Bank of Nova Scotia account.

19. On August 16, 1982, Leith Leasing purchased the Bluebird from Mitchell Olds–Cadillac. On September 27, 1982, Mitchell delivered another check from Mitchell Olds–Cadillac to Costalotta in the amount of $18,000.00 for the balance of the repurchase price.

20. When Defendant, as "James Owens," purchased the Airstream trailer from Land Yacht Trailer Sales he told the seller that he had previously owned a Bluebird.

E. Continental Aero–Marine, Inc.

1. Defendant began flying airplanes in the 1960's. On May 2, 1978, Marshall Nance formed Continental Air Services, Inc., a Florida corporation, for Defendant and named Defendant as majority shareholder. The purpose of Continental Air Services was to purchase an airplane and to be a liability shield.

2. Holding an airplane in a corporate name as a liability shield is a common and even recommended practice, even if, as is often the case, the plane is for personal use.

3. In 1978 Continental Air Services purchased a 1965 S–35 Beechcraft airplane for Defendant's use.

4. On May 11, 1979, William C. Ray and Rick Steelman, a salesman for Piedmont Aviation, flew from Winston–Salem, North Carolina, to Florida in a Beechcraft A–36 Bonanza to meet Defendant and discuss buying the airplane. Defendant told Steelman that he could not afford to purchase the plane at that time.

5. In April 1980 Steelman again discussed selling an A–36 Beechcraft Bonanza to Defendant and on April 18, 1980, Defendant ordered a 1980 model from Piedmont Aviation. Throughout the correspondence between Beechcraft (the manufacturer) and Piedmont Aviation (the seller) Defendant is referred to as the customer without mention of any corporation.

6. On May 13, 1980, Continental Aero–Marine, Inc., was incorporated in North Carolina by William C. Ray at Burton Levey's request.

7. On September 17, 1980, Piedmont Aviation sold a 1980 Beechcraft Bonanza to Continental Aero–Marine, Inc., for $122,500.00 plus trade-in of the 1965 S–35 Bonanza owned by Continental Air Services. The 1980 plane was registered in the name of Continental Aero–Marine.

8. Defendant told Rick Steelman that the deposit had to be in the form of a trade-in because Defendant would not have the cash until he sold some apartments. Defendant was the actual owner of the 1965 Beechcraft S–35 and merely held it in the name of Continental Air Services. Continental Air Services was involuntarily dissolved in December 1980 for failure to file an annual report.

9. The $122,500.00 balance for the purchase of the 1980 A–36 was paid by check dated September 10, 1980, on Burton Levey's firm trust account.

10. A Bank of Nova Scotia cashier's check dated August 18, 1980, in the amount of $125,000.00 was deposited in the Levey firm trust account on August 22, 1980.

11. Defendant requested a special registration number including his initials, "N9DV," in December 1980.

12. The 1980 A–36 was purchased and owned by the Defendant and used exclusively by him.

13. Insurance on the airplane was through the Penn General agency and Defendant was listed as the pilot. Defendant told both Philip Keidaish and Harvey Mitchell that he had bought a new airplane.

14. Defendant received flight instruction in the new plane from Ben David Smith, paid cash for his flight time, and did not retain the receipts.

15. From October 1980 to December 29, 1981, Defendant made at least thirty-four (34) recorded flights in the A–36, N9DV, including twenty (20) between September 18, 1981, and October 16, 1981. Most of the flights during that period were local and instructional flights, but Defendant flew to Georgia at least twice, to Knoxville, Tennessee, and to El Paso, Texas.

16. Defendant, using the name "Jim Owens," leased a hangar for N9DV at El Paso International Airport from April 16, 1982, to July 8, 1982.

17. During the spring of 1982 Rick Steelman was told by William C. Ray to try to sell N9DV because Defendant needed money. In early 1982 William Snouffer was also told by William C. Ray that Defendant was selling his airplane and the Bluebird because he was afraid of being indicted in Florida.

18. On July 2, 1982, Ray and Steelman flew to an airport in Georgia and met Defendant, at which time Steelman received keys to the hangar in El Paso, Texas. On July 3, 1982, Continental Aero–Marine sold N9DV to Ray Breeden of the Breeden Company, Inc., for $128,000.00. Steelman went to El Paso, Texas, and got the plane out of the hangar and flew it to Norfolk, Virginia, to deliver to Breeden.

19. N9DV was subject to a security agreement in the amount of $122,500.00 held by Trans–Canadian Aero–Marine, Inc., for which Levey was trustee. This lien was paid off on July 3, 1982, by a cashier's check from Breeden in the amount of $122,500.00, which was deposited by Darryl Myers in the Guiness Mahon Cayman Trust Ltd. account.

20. Trans–Canadian Aero–Marine, Inc., is not alleged in the indictment to be an enterprise corporation. Although likely controlled by the Defendant, the government's evidence does not establish beyond a reasonable doubt that Defendant used funds derived from his illicit activities to fund the purchase of N9DV through Trans–Canadian Aero–Marine, Inc.

21. Evidence presented at trial establishes only that Continental Aero–Marine was incorporated by a partner of William C. Ray and that the corporation received a check in the amount of $5,500.00 from Ray Breeden which was deposited by William C. Ray. Such evidence is not inconsistent with a legitimate loan to Continental Aero–Marine from Trans–Canadian Aero–Marine, possibly an independent, separate lender controlled by Darryl Myers.

## DISCUSSION

### I.

■ Defendant contends that the forfeiture allegations included in the indictment fail to satisfy Federal Rule of Criminal Procedure 7(c)(2) with respect to Count One because the allegations appear beneath Count Two and therefore do not notify Defendant that conviction on Count One will subject him to forfeiture.[1] Since Defendant was acquitted on Count Two and he had insufficient notice of forfeiture as to Count One, Defendant argues that his assets should not be forfeited.

The court does not accept this argument. The essential purpose of Rule 7(c)(2) is "to provide persons with adequate notice of the extent to which forfeiture is sought." *United States v. Amend,* 791 F.2d 1120, 1125 (4th Cir.), *cert. denied,* 479 U.S. 930, 107 S.Ct. 399, 93 L.Ed.2d 353 (1986). The indictment included a section entitled "Forfeiture Allegations" which began with the

---

1. Rule 7(c)(2) provides: "No judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information shall allege the extent of the interest or property subject to forfeiture."

statement: "1. The Grand Jury realleges Counts One and Two of the indictment in their entirety for the purpose of alleging forfeitures," under 18 U.S.C. § 1963.

This statement is sufficiently clear to notify Defendant of the government's allegations. First, the Fourth Circuit has ruled that incorporation by reference can be sufficient notice to satisfy Rule 7(c). *United States v. Caldwell*, 544 F.2d 691, 695 (4th Cir.1976) (the indictment does not have to be "model of written clarity" to be legally sufficient). Secondly, the fact that the section immediately followed the listing of the overt acts evidencing the Count Two conspiracy should not have misled Defendant, particularly since it also immediately preceded Count Three, to which forfeiture does not apply. Placement of the forfeiture allegations between Counts Two and Three was logical, since they constituted a lengthy list applicable to the two preceding counts but not to the count which followed. Finally, the "open file" policy in this district gave Defendant adequate notice of the government's intention to seek forfeiture. *Amend*, 791 F.2d at 1125.

The court restricts its consideration of forfeiture to the assets included in the indictment. Since the government declined to pursue the general descriptions of items in allegations 2(j) and 2(k) of the indictment at the forfeiture hearing, any items solely within those categories will not be considered for forfeiture. Because the remainder of the items are adequately described a bill of particulars is unnecessary.

■ The government alleged forfeiture pursuant to 18 U.S.C. § 1963(a)(1), (2), and (3). The version of Section 1963 applicable at the time of Defendant's offense contained only two subsections under Section 1963(a). Although the court recognizes that the 1984 revision substantially altered the language of the provision, the court rejects Defendant's contention that the earlier version applicable here did not provide for seizure of substitute assets. *See Russello v. United States*, 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983) (fact that revision of Section 1963 explicitly includes profits and proceeds does not mean

prior version did not include them). The new version simply clarified the existing coverage with respect to such assets. *Id.* (amendment is in response to narrow readings which the Court now rejects). This court also rejects Defendant's claim that application of the forfeiture provisions as alleged amounts to a violation of the constitutional prohibition against *ex post facto* laws. *See* U.S. Const. art. I, § 9, cl. 3. The statutory provisions in effect at the time of Defendant's criminal offense will be applied, without any change in the quantum of punishment.

## II.

As part of that punishment Section 1963(a) (as it existed prior to 1984) requires forfeiture of:

> (1) any interest he has acquired or maintained in violation of Section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of Section 1962.

18 U.S.C. § 1963(a) (1970).

■ 18 U.S.C. § 1962 contains the substantive criminal provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). RICO forfeiture under Section 1963(a) is *in personam* not *in rem*, *United States v. Ginsburg*, 773 F.2d 798, 800 (7th Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986); *United States v. L'Hoste*, 609 F.2d 796, 813 n. 15 (5th Cir.), *reh'g denied*, 615 F.2d 383, (5th Cir.) *cert. denied*, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980), which means that the emphasis is on penalizing the wrongdoer by separating him from his ill-gotten benefits, rather than on confiscating "guilty" items. *Russello v. United States*, 464 U.S. at 28, 104 S.Ct. at 303; *Ginsburg*, 773 F.2d at 802. Because Section 1963 is predicated on Section 1962, however, only those benefits achieved through violation of one of the provisions of Section 1962 can be forfeited.

In this case Defendant was accused and convicted of violating only subsection (a) of Section 1962, which provides that:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a) (1970).

The act of receiving racketeering-related income is not sufficient to constitute this offense. Therefore, Defendant does not forfeit the money he received from Keidaish solely on the basis of it being bribe money, because at that time he had not committed a RICO violation. As a United States Customs Officer his receipt of money in exchange for violating his duty was the criminal act defined by 18 U.S.C. § 201(c), and since Defendant did so more than once during the 1970's he is a "person who has received any income derived ... from a pattern of racketeering activity," *see* 18 U.S.C. §§ 1961(1)(B) and (5). In order to amount to a violation of Section 1962(a), however, Defendant must have thereafter used or invested some part of that income in an enterprise engaged in or affecting interstate or foreign commerce, and the forfeiture provisions of Section 1963(a) will apply only to those parts of such income that he so used or invested.

■ RICO forfeiture is not limited to interests which the Defendant acquired in an "enterprise," however. Although several courts have construed Section 1963(a) in the past in a way which requires forfeiture only of such ownership interests, *United States v. Marubeni Am. Corp.*, 611 F.2d 763 (9th Cir.1980); *United States v. McManigal*, 708 F.2d 276 (7th Cir.), *vacated*, 464 U.S. 979, 104 S.Ct. 419, 78 L.Ed.2d 355 *modified*, 723 F.2d 580 (7th Cir.1983); *United States v. Thevis*, 474 F.Supp. 117

(N.D.Ga.1979), *aff'd*, 665 F.2d 616 (5th Cir.), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982); *United States v. Meyers*, 432 F.Supp. 456 (W.D.Pa. 1977), the United States Supreme Court has expressly overruled those decisions and has made it clear that the restrictive definition of "interest" applies only to Section 1963(a)(2), which refers to "any interest *in.*" *Russello*, 464 U.S. at 21, 104 S.Ct. at 299 (emphasis added). Subsection (a)(1) does not address just "interests in" but "any interest," and the Court has construed this broadly to cover virtually any property interest, including the right to profits and proceeds. *Id.* Therefore, the forfeiture provisions apply to any item or property interest which bears the requisite connection to an "enterprise," and which Defendant acquired or maintained with tainted funds, as well as to the profits or proceeds from disposition of such interests.

Although *Russello* involved a violation of Section 1962(c), *i.e.*, racketeering activity carried out through an enterprise, rather than a post-racketeering use or investment of tainted funds, the forfeitable interests under both subsections (c) and (a) should include profits and proceeds. The difference between the two subsections lies in the timing of the violation. Subsection (c) is violated during the conduct of the racketeering activity and thus "profits and proceeds" refers to any monies made through the racketeering. In contrast, at the time Defendant engaged in racketeering activity (*e.g.*, taking the bribes) no enterprise is alleged to have existed, and hence RICO had not yet been violated. The RICO offense occurred when the racketeering-derived funds were invested, and forfeiture is only a consideration as of that time. From that point onward, however, the effect of Section 1963 on subsections (c) and (a) are the same, and profits and proceeds derived from forfeitable interests should also be forfeitable.

■ Moreover, once the Section 1962(a) violation is proven, it should not make any difference whether the interest Defendant thereby obtained still exists. In *United States v. Ginsburg,* the Seventh Circuit

expressly rejected Defendant's contention that the government must prove existence of the interests or proceeds at the time of conviction. 773 F.2d at 800. The court reasoned that because criminal forfeiture is *in personam,* the sanction follows defendant personally regardless of how he decides to spend or squander the profits. *Id.* at 801. To hold otherwise would defeat the purpose of the forfeiture provisions as recognized by the Supreme Court in *Russello* (to separate the racketeer from his ill-gotten gains, 464 U.S. at 28, 104 S.Ct. at 303) by permitting Defendant to use money he should not have had. *Ginsburg,* 773 F.2d at 802. Also, limiting forfeiture to existing tainted interests would allow the Defendant to escape the economic sanction by living lavishly and expending the funds on short-term benefits, *e.g.,* "wine, women and song." *Id.*

The *Ginsburg* court carried this reasoning further in ruling not only that the government is not restricted to recovering specific proceeds, but also that once a violation is shown the government need not even trace the proceeds beyond that point. *Id.* at 802.

> [W]hile the government's interest in the profits or proceeds of racketeering activity does not *attach* until conviction, its interest *vests* at the time of the act that constitutes the Section 1962 violation and cannot subsequently be defeated, as far as Section 1963(a)(1) is concerned, if the defendant dissipates or transfers away the proceeds subject to forfeiture.

*Id.* at 801 (emphasis in original); *see also United States v. Navarro–Ordas,* 770 F.2d 959, 969–70 (11th Cir.) (court can enter what amounts to a personal money judgment, order forfeiture of the amount and place the burden of satisfying the order on the defendant, regardless of what he did with the profits), *reh'g denied,* 776 F.2d 1057 (1985), *cert. denied, Rodriguez v. United States,* 475 U.S. 1016, 106 S.Ct. 1200, 89 L.Ed.2d 313 (1986).

Thus, the Seventh Circuit concluded that Section 1963(a)(1) requires neither tracing of proceeds nor proof of present existence, because to do so would "render the statute

... a virtual nullity," *id.* at 802, and defeat the intent of criminal forfeiture. The Fourth Circuit found *Ginsburg* persuasive, and followed it in ruling that "the government need not have offered evidence that the forfeitable assets were still in existence at the time of ... conviction." *United States v. Amend,* 791 F.2d at 1127, n. 6. The court follows the lead of the Fourth Circuit and accepts the *Ginsburg* reasoning.

The "relation back" doctrine, that the government's interest vests at the time of the Section 1962 violation, excuses this court from following the tainted funds after Defendant used or invested them in or through an "enterprise," and permits a finding that the entire amount of such use or investment is forfeitable. However, because the Section 1962(a) violation occurs only when income derived from racketeering is so used or invested, and not at the time of the racketeering activity itself, the court must trace tainted funds from the bribes to the uses or investments.

### III.

The government seeks forfeiture of the proceeds from Defendant's sale of the Colonial Manor Apartments. Such proceeds are not forfeitable, however, despite Defendant's investing of at least $100,-000.00 of income derived from racketeering in the apartment complex. Although some transactions related to real estate have been found to affect interstate commerce, *see Goldfarb v. Virginia State Bar,* 421 U.S. 773, 783, 95 S.Ct. 2004, 2011, 44 L.Ed. 2d 572 (1975) (title examinations); *United States v. Nerone,* 563 F.2d 836, 850–51 (7th Cir.1977) (rental of pieces of real estate for mobile homes); *United States v. Romano,* 523 F.Supp. 1209, 1210 n. 4 (S.D.Fla.1981) (investment of tainted funds in an inn), *rev'd on other grounds,* 736 F.2d 1432 (11th Cir.1984), the law is not clear that purchase of a residential apartment complex in one's own name constitutes investment in an enterprise relating to interstate commerce, in violation of Section 1962(a). Moreover, the government did not allege the Colonial Manor Apartments to be an "enterprise" and thus cannot assert Defen-

dant's investment of tainted funds in Colonial Manor to be a RICO violation subjecting the funds to forfeiture.

This does not mean that the substantial Colonial Manor proceeds are entirely beyond the reach of Section 1963. Those proceeds are still "income derived ... indirectly, from a pattern of racketeering activity" and subsequent use or investment of the proceeds in an "enterprise" is a Section 1962(a) violation.

■ To construe the language of Section 1962(a) otherwise would oppose logic and the broad legislative purpose underlying RICO. *See Russello,* 464 U.S. at 27, 104 S.Ct. at 302. Although RICO forfeiture is intended to apply solely to racketeering income or its proceeds which are put into or drawn from interstate or foreign commerce, the government's reach should not be abridged by intervening investment of tainted funds in non-enterprise assets, any more than it would be by letting the racketeering income sit in a bank account before investing in an "enterprise."

In *United States v. McNary,* 620 F.2d 621 (7th Cir.1980), one of the few circuit court cases involving Section 1962(a), the Seventh Circuit reasoned that the words "directly or indirectly": "demonstrate that the statute contemplates situations in which racketeering monies will not be directly or immediately employed to establish or operate interstate enterprise." 620 F.2d at 628.

Immediate or direct use is not required to violate Section 1962(a), and it need not be the illicit income which is ultimately invested; proceeds of such income is sufficient. *Id.* To require otherwise would render the statute ineffectual where defendants used surreptitious accountings and other vehicles designed to thwart tracing, and would thereby defeat the "liberal purpose of the RICO act." *Id.*

Although the Seventh Circuit did not reach the forfeiture issue in *McNary,* clearly if indirect investment of the proceeds of racketeering activity constitutes a Section 1962(a) violation then any interest acquired or maintained thereby shall be forfeited.

To summarize the effects of Section 1962(a), Defendant must forfeit the value of all of the interests he acquired or maintained by using or investing racketeering income or its profits or proceeds. Because all of the Colonial Manor proceeds can be considered to be "derived ... indirectly from" Defendant's racketeering activity (insofar as without the tainted $100,000.00 he would not have bought the apartments and made the profits), whatever amount of such proceeds can be traced into an "enterprise" will be forfeitable.

Under Section 1963(a)(2), Defendant must also forfeit any existing interest he has in "enterprises." There is case law which suggests that this might include offices or positions he holds in such enterprises, *United States v. Rubin,* 559 F.2d 975, 990–92 (5th Cir.) (forfeiture of offices currently held is proper), *reh'g denied,* 564 F.2d 98 (5th Cir.1977), *reh'g denied,* 572 F.2d 320, (5th Cir.1978) *vacated on other grounds,* 439 U.S. 810, 99 S.Ct. 67, 58 L.Ed. 2d 102 (1978), *on remand,* 591 F.2d 278, (5th Cir.1978) *cert. denied,* 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979); *United States v. Thevis,* 474 F.Supp. 117, 144 (N.D. Ga.1979) (voting rights or management contract may be subject to forfeiture if afford source of influence over the enterprise); however, since the government did not seek surrender of any such positions, and in light of the prison sentence to be imposed on Defendant, such forfeiture is inapplicable.

### IV.

■ Only those assets obtained by the use or investment of funds in or through an enterprise engaged in interstate or foreign commerce are forfeitable. Corporations may be or may together comprise an "enterprise" for RICO purposes. 18 U.S.C. § 1961(4). Therefore, to the extent Defendant used funds derived from the bribes to purchase assets in a corporate name (a practice which can be characterized as investing in the enterprise) the amount of funds so used, or the existing assets, are forfeitable.

Defendant represented himself as an agent of several corporations including Chardon Company, N.V., Real Tech International, Ltd., Silver Realty Corp., Costalotta Inc., and Continental Aero–Marine, Inc. The evidence shows (1) that Defendant purchased assets through four of these corporations and (2) that he did so for the personal use of he and his wife. Moreover, with the exception of the A–36 Bonanza, the acquisitions were made with funds directly or indirectly traceable to the bribe payments from Keidaish.

The second point, that the assets in question were for the use of Defendant and his wife, is undeniable. The evidence is clear that the two Mercedes titled to Real Tech, the FMC and both Jeeps originally purchased by Silver Realty, and the Bluebird acquired by Costalotta, as well as the A–36 Bonanza held by Continental Aero Marine, were ordered and/or purchased upon the express request of or statement of interest by Defendant. Also, the insurance policies for each vehicle list Defendant and/or his wife as the principal and exclusive drivers. Credible evidence demonstrates that at least occasionally Defendant used these assets, plus the 1980 Sea Ray titled to Real Tech, for the entertainment of friends, including Harvey Mitchell, Rick Steelman, Marshall Nance, and William Snouffer. Further, Defendant's name usually arose with respect to repairs and transactions involving the vehicles. Defendant used the 1980 Jeep to pass his Tennessee driving test in January 1982 under the alias "James Owens," and his wife used it to pick up Defendant and Ben David Smith at the Ft. Lauderdale airport.

The first point, that the Defendant and not the corporation was the actual purchaser of the vehicles, is also heavily supported by circumstantial evidence. Usage of these assets taken individually might not be inconsistent with the characterization of Defendant as a representative or employee of these corporations. Company cars and other assets as well may be made available for an employee's exclusive use and in such cases the agent would likely be listed as the principal driver and would be the one to have the repairs made. However, consider-

ation of all of the circumstances in evidence in this case does not permit such a finding but instead logically compels the conclusion beyond a reasonable doubt that Defendant in effect purchased and owned these assets, and that at his direction they were held in the various corporate names.

To begin with, within a span of ten days (February 8 to 18, 1980), Real Tech purchased two Mercedes, and put both of them at Defendant's disposal. While the court might attribute provision of one Mercedes as a company car merely to unusual corporate munificence, the court finds the notion that a corporation would give an agent a second luxury car to be used by the agent's spouse wholly unbelievable. Such profligacy demonstrates a subordination of corporate well-being to the lifestyle of its agent that strongly suggests that the agent and the corporation are one and the same, or at least that the former controls the latter.

This suspicion is heightened by the fact that on the day Real Tech purchased the 1979 Mercedes for Defendant's use, Silver Realty purchased a 1980 Jeep CJ–7, also for the use of Defendant. Both purchases were made from Burlington Dodge which was owned by Defendant's aforementioned friend, Harvey Mitchell, whom Defendant met when he bought Colonial Manor Apartments. Mitchell, a motor vehicle dealer, proved to be an ideal ally for Defendant's cash purchases and attempted concealment of ownership of several vehicles. Since the evidence solidly supports a finding that Silver Realty is a subsidiary of Real Tech, the court must wonder why related corporations would provide the same agent with two and then three company vehicles, unless the agent is pulling the strings.

As if this were insufficient largess, both Real Tech and Silver Realty had already provided recreational vehicles for Defendant's use. Two days prior to purchase of the first Mercedes, Real Tech purchased a 1980 Sea Ray motor boat which Defendant kept at his Ft. Lauderdale home. The 1980 Jeep replaced a 1979 model which had been damaged in the course of an outing Defendant and friends made to the North Carolina coast. The Jeeps, in turn, were ac-

quired because Defendant wanted a vehicle to tow behind the FMC which Silver Realty provided him.

The circumstances surrounding acquisition of the FMC provide additional support for the conclusion that Defendant was using the corporations merely as holding companies for his acquisitions, as well as suggesting that he had something to hide. Although Defendant paid cash for the FMC in the summer of 1978, the coach was not titled to Silver Realty until May 18, 1979, and in fact Silver Realty was not incorporated until May 7, 1979. This not only indicates that Defendant purchased the FMC personally, but coupled with the fact that prior to May it had been titled to Mitchell's dealership at Defendant's request, it shows both that Defendant did not want his ownership of the FMC known and that Silver Realty was created to hold title for Defendant.

The disposal of the 1979 Jeep also indicates Defendant's control over corporate assets. After the Jeep had been damaged Defendant returned it to Mitchell in exchange for a 1980 Dodge Omni. The Omni was not titled to Silver Realty, the legal owner of the Jeep; rather it was delivered to Marshall Nance, who had no affiliation with Silver Realty but was a friend of both Defendant and Mitchell. This informality about corporate property is inconsistent with the position of Silver Realty as a separate entity.

Two other instances impugn the independent status of Silver Realty's Cayman Island parent, Real Tech, as well. The first is that nine months after Real Tech purchased the two Mercedes it sold them to Defendant's wife at a considerable discount. The second concerns the Groometown Road property in Greensboro. Not only did Mitchell enter into the option agreement with Defendant personally, rather than as an agent for Real Tech, but in 1983 after Mitchell had moved out, the corporation sold the property to Defendant's parents for an amount well below the apparent value. Passage of assets to Defendant's closest relatives at bargain prices is significant evidence that the transactions were not effected at arm's length, and that Defendant controlled their disposition. Moreover, the fact that both Mercedes were titled to Defendant's wife affords support for finding that Real Tech was used in order to clear title to the cars.

Connections between Defendant and the corporations also extend to Costalotta Inc. First, the court heard credible testimony linking Defendant to Costalotta. Also, substantial evidence supports a finding that the extravagant Bluebird was acquired in the name of Costalotta at the request and for the exclusive use of Defendant. In fact, as with the FMC, the corporation which ultimately "purchased" the Bluebird was not formed until well after the order had been placed. This again suggests that the corporation was created to hold the asset for Defendant, a practice which is not unusual regarding recreational vehicles or motor homes. In addition, the Bluebird was sold half a year later because Defendant needed cash and was afraid of being indicted.

Another connection between Defendant, Costalotta, and the other corporations is the chain of title to the 1980 Jeep. Specifically, in March 1981 Silver Realty, a North Carolina corporation, passed title to both the Jeep and the FMC to Hicone Motors, a Greensboro dealership operated by a cousin of Defendant's North Carolina attorney William Ray. On the same day Hicone sold the vehicles to Ray for a fraction of their value. Ray performed the transaction for both sides and used the address of a Knoxville apartment which he leased just prior to and throughout that time but did not live in.

In addition to these suspicious circumstances, on August 24, 1981, Ray assigned title to the FMC to Mitchell's dealership, which later resold it for $20,000.00 more than Ray had paid, and Ray sold the Jeep to Costalotta. While it was titled to Costalotta, Defendant and his wife used the Jeep and then in July of 1982, a time when Defendant needed money and was concerned about indictment, Costalotta sold it back to Ray. These machinations, like Mary Anne Vogt's purchase of the Mer-

cedes, were paper transactions intended to clear title to the Jeep and the FMC, and prevent discovery of Defendant's considerable holdings.

Despite efforts to conceal his interests, Defendant was the actual owner of the assets held in corporate solution. The court cannot accept as reasonable the proposition that four or five different corporations, at least some of which were related and newly formed, would make him their agent at roughly the same time and would satisfy his every whim with extravagant purchases. The formal structure collapses under the weight of repeated coincidence, connection, and adverse testimony.

In order for Defendant to forfeit the assets, however, the government had to prove not only that the assets were purchased through, or represented investment in, the corporations, but also that the funds involved were traceable to the bribes Defendant received. The court is convinced beyond a reasonable doubt that Defendant received bribe payments from Philip Keidaish between 1974 and 1978 inclusive, in violation of 18 U.S.C. § 201(c)(3). Defendant's financial situation as reflected on his and his wife's joint tax returns for the years prior to 1980 do not reflect receipt of such sizable sums. Their reported income could not support extravagant purchases and their legitimate savings was similarly too modest to fund the numerous acquisitions by the involved corporations.

The evidence already discussed compels the conclusion that Defendant did in fact purchase these assets through the corporations for his own use. Again it is wholly unbelievable that entities not owned and controlled by Defendant would expend substantial corporate funds to provide an agent with such expensive vehicles, and allow bargain sales or gratuitous disposition of their assets to the agent's family and friends, especially when the agent represents several corporations at one time. The logical conclusion therefore is that, since Defendant's legitimate net worth would not permit him to make such purchases, since he had an illegal source of substantial funds, and since he did in fact make those purchases, the acquisitions were made at least in part with tainted funds.

That Defendant had to use the illegitimate funds to make such purchases is more certain in light of the various acquisitions Defendant and his wife also made in their own names prior to the sale of Colonial Manor. These include the purchase and funding of Colonial Manor itself, for which the over-the-table down payment would have virtually exhausted their legitimate savings. They also obtained Keidaish's lavish Ft. Lauderdale home, ostensibly for a purchase money mortgage, but the payments on such mortgage would be substantial regardless. Finally, in addition to the company cars available to Defendant, he and his wife also purchased for cash a 1980 Cadillac de Ville in early 1980. Certainly prior to the November 1980 sale of Colonial Manor Defendant's legitimate financial situation would not have permitted all of these purchases.

The court realizes that its analysis is based in large part on circumstantial evidence of Defendant's purchases and control, and on evidence of his net worth with respect to tracing of the racketeering income. Circumstantial evidence may be sufficient for conviction, however, particularly where the situation suggests an effort to avoid creation of direct evidence, such as by use of false names, straw men, or foreign banks, *United States v. Parness*, 503 F.2d 430, 436 (2d Cir.1974) (absence of direct evidence in RICO case is neither surprising nor conclusive; circumstantial evidence is sufficient for conviction, especially in light of efforts to conceal use of funds and a scheme concocted to avoid suspicion), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975), all of which were present here. Similarly, though the court should not rely exclusively on evidence of net worth in tracing illicit proceeds, such evidence can be considered. *United States v. Long*, 654 F.2d 911, 915 (3d Cir.1981) (evidence that defendant had no other sources of legitimate income shows that plane was purchased with proceeds of illegal enterprise).

In this case the conclusion drawn from evidence of Defendant's net worth is supported by substantial circumstantial evidence relating to off-shore accounts. First, Defendant was familiar with several Caribbean islands, including the Cayman Islands, and had contact with Darryl Myers and the Bank of Nova Scotia. Second, the government elicited credible testimony that Defendant was familiar with the process of setting up off-shore corporations and was taking money off-shore. Third, the Levey, Levenstein law firm which Defendant often employed had numerous dealings in the islands, regularly transferred funds from off-shore banks, and Levenstein admitted taking tainted money off-shore for Keidaish. Fourth, after Defendant sold Colonial Manor he kept the bulk of the savings in "island accounts" as listed on his tax returns.

A final factor is that several of the purchases involving Defendant, which were made either in corporate solution or in Defendant's name, were made with funds taken directly or indirectly from off-shore accounts (with either Guiness Mahon or the Bank of Nova Scotia) and which passed through the firm trust accounts of Myers, Levey, Ray, or some combination thereof. These include the purchase of Colonial Manor with Chardon funds, payment for the Bluebird by a Bank of Nova Scotia check, a cashier's check from Bank of Nova Scotia to Levey to pay for the A–36 Bonanza, and acquisition of the Airstream trailer by James Owens by check drawn on Guiness Mahon. Many of the other purchases (the FMC, the Jeeps) were made in cash, sometimes on behalf of newly-formed or even not-yet-formed corporations controlled by Defendant.

Similarly, proceeds of sales from many of the assets, including the A–36 Bonanza and the Bluebird, as well as the money "paid" by Mary Anne Vogt for the two Mercedes, were eventually deposited back into island accounts. There are two additional connections between the islands, the tainted funds, and the corporate purchases controlled by Defendant. One is the transfer of $350,000.00 to Real Tech from the Bank of Nova Scotia immediately following the breakdown of negotiations for the $310,000.00 Chardon loaned to Mitchell, which loan would have come from Chardon's or its representative Myers' Bank of Nova Scotia account. Second is the check to Costalotta for the proceeds from sale of the Bluebird. Myers, presumably as agent for Costalotta, endorsed the check over to Real Tech before depositing it in the Bank of Nova Scotia.

The conclusion compelled by all of this evidence is that the tainted funds were put into off-shore accounts and drawn down through attorneys' client trust fund accounts to purchase assets on behalf of the corporations. Although due to island policies the identities of all corporate directors and account holders were not available, the immense body of circumstantial evidence nevertheless overcomes all reasonable doubt about Defendant's participation in the corporate acquisitions and the source of the corporate funds.

The exception to the proof beyond a reasonable doubt concerns the A–36 Bonanza. The evidence makes it obvious that the plane in fact belonged to Defendant and was merely held in a corporate name, possibly for liability purposes. Much of this evidence, such as the leasing and use of a hangar in El Paso under the name Jim Owens and the fact that Defendant created a dummy corporation to hold the asset, lends additional support to the court's other conclusions. However, the court cannot draw the conclusion that Defendant put tainted funds into the corporation to purchase the plane. There is credible testimony that Defendant was hesitant to obtain a new plane prior to selling his apartments and also that he sold the A–36 in 1982 because he needed money. The former suggests that Defendant waited until he received the proceeds of the Colonial Manor sale and then used them in part to acquire the plane, while the latter casts some doubt upon the separateness of the lienholder, Trans–Canadian Aero Marine. Since only $5,500.00 of the sale proceeds from Ray Breeden went to Continental Aero–Marine it would hardly be worth it for Defendant to have sold the plane if that

is the extent of the cash he would receive. Moreover, Trans–Canadian Aero Marine is another corporation represented by Darryl Myers out of his Bank of Nova Scotia account.

However, unlike with respect to the other assets, in this instance there is a feasible alternative explanation. Trans–Canadian held the lien on the plane, which lien was paid off upon its sale. The issue is not whether Defendant was the actual purchaser, but where he obtained the funds. The court is unable to conclude beyond a reasonable doubt that Trans–Canadian was not a separate corporation, over which Defendant had no control. It could have been an independent lending corporation, represented by an attorney who had prior dealings with Defendant and knew that the Colonial Manor sale was on the horizon, so that a loan would not be a risk. Another explanation may be more likely, but it is not indisputably the case.

The court is also unable to find sufficient identity between Chardon Company, N.V., and Defendant. Although the facts surrounding the relationship, especially the willingness of the corporation to lend Mitchell substantial sums without financial information and the $500,000.00 "key man" insurance policy to which Defendant would have been the beneficiary, arouse suspicion, they are not entirely inconsistent with the status of Chardon as an independent lender represented by Myers and Defendant. Either way this has little effect on the forfeiture analysis other than providing an additional connection between the tainted funds and Colonial Manor. The court is satisfied with the other evidence to the effect that Mitchell received under-the-table payments and so finds that the purchase of Colonial Manor was made with funds derived from Defendant's racketeering activity. Consequently, as above noted, the proceeds from sale of the apartments remain tainted. This in turn means that, although Defendant obviously had sufficient funds to purchase numerous assets after 1980, any assets he acquired through enterprise corporations using Colonial Manor proceeds, namely the Bluebird Wanderlodge, or the amount of the proceeds so used, are forfeitable.

## V.

Defendant has expressed two additional concerns: (1) that there be a sufficient nexus between the racketeering activity and the assets forfeited, and (2) that the forfeiture not be disproportionate to the offense. Neither issue poses a problem in this case.

■ The nexus requirement is clearly satisfied. In *United States v. Conner*, 752 F.2d 566 (11th Cir.), *cert. denied, Taylor v. United States*, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985), the Eleventh Circuit said that in finding the defendant guilty the jury had decided that a nexus existed. This court recognizes the validity of that holding with respect to the verdict, but also realizes that an order of forfeiture requires more specific findings. For a conviction the jury need only be satisfied that "any part" of income derived from racketeering activity was used or invested, but the court (or the jury if the Rule 31[e] right had not been waived) must determine what parts, *i.e.*, what amounts, of such income have been used or invested in order to deduce the appropriate forfeiture amount.

In making those specific findings, however, the court satisfies the nexus requirement. The nexus consists of the fact that the interests (assets) were purchased by Defendant's use or investing of income derived from racketeering. No further nexus is required by Section 1962(a) because subsection (a) is directed at subsequent investment. Unlike *in rem* forfeiture, the assets need not have been involved in the racketeering. Nor is it necessary that racketeering occur at the time or after these interests were acquired. The Section 1962(a) violation can occur long after the last racketeering act; therefore the essential link between the funds used and their initial source is sufficient.

■ Nor is the penalty to be imposed disproportionate to the offense. First of all, forfeiture is a mandatory penalty which the court must impose when the

jury finds a violation of Section 1962. *United States v. Hess*, 691 F.2d 188, 190 (4th Cir.1982). Secondly, although some circuits have expressed hesitation about ordering forfeiture of an entire business interest, regardless of the amount of legitimate versus illegitimate activity, *see United States v. Huber*, 603 F.2d 387, 397 (2d Cir.1979) (emphasizing the district court's discretion and warning against "draconian and perhaps potentially unconstitutional applications of the forfeiture provision"), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *United States v. Busher*, 817 F.2d 1409, 1415 (9th Cir.1987) (recognizing the need for courts to use their discretion in fashioning forfeiture order within bounds of eighth amendment), others, including the Fourth Circuit, have maintained that Section 1963 requires forfeiture of defendant's entire interest, if it is in violation of Section 1962. *Hess*, 691 F.2d at 190; *United States v. Walsh*, 700 F.2d 846, 857 (2d Cir.) (RICO forfeiture is intended to make defendant forfeit entire interest in the RICO enterprise), *cert. denied*, 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983); *United States v. Rubin*, 559 F.2d at 991–92 (court does not have to determine the degree of the enterprise's taint).

Thirdly, even accepting the position of the Ninth Circuit in *Busher* that the eighth amendment imposes constraints upon forfeiture, the present case is fully compatible with the Ninth Circuit's analysis. The Ninth Circuit held that trial courts must use their discretion in determining whether the interest forfeited is "grossly disproportionate" to the offense. The court also stated, however, that:

> [T]he forfeiture is not rendered unconstitutional because it exceeds the harm to the victims or the benefit to the defendant. After all, RICO's forfeiture provisions are intended to be punitive. The eighth amendment prohibits only those forfeiture [sic] that, in light of all the relevant circumstances, are *grossly* disproportionate to the offense committed.

817 F.2d at 1415 (emphasis in original).

Further, the *Busher* court noted that in considering the gravity of the offense the harm done is an important factor, and the magnitude of harm is drastically increased when the crime is likely to have "severe collateral consequences, *e.g.*, drug addiction." *Id.*

Finally, the court cautioned against ordering forfeiture of a defendant's entire interest if the enterprise is essentially legitimate and the RICO violations are minor. However, "if … an interest in an enterprise was acquired entirely or almost entirely with ill-gotten funds, it would not normally violate the eighth amendment to order forfeiture of all of defendant's interest in that enterprise."

This court finds that the penalty to be imposed upon Defendant is not grossly disproportionate to his offense. Defendant violated a public trust for substantial personal gain, and in so doing quite likely contributed to substance abuse, by permitting Keidaish and his associates to import controlled substances. Moreover, since the interests to be forfeited were all acquired with income derived from Defendant's racketeering, complete forfeiture of those interests is justified.

The court also finds the Second Circuit's holding in *United States v. McKeithen*, 41 Crim.L.Rep. 2289 (2d Cir. June 30, 1987), inapposite. That case involves forfeiture of real estate under the Continuing Criminal Enterprise ("CCE") statute (21 U.S.C. § 848). Although CCE forfeiture is similar to the RICO section, 21 U.S.C. § 848 does not contain a provision equivalent to 18 U.S.C. § 1963(a)(1). The holding in *McKeithen* was that only part of the real estate afforded a source of influence over the existing enterprise. The court's findings in the present case, however, have not concerned influence over an existing enterprise, but rather acquisition of interests with use of racketeering funds, and therefore the closer nexus required by the Second Circuit in *McKeithen* is not applicable.

The 1984 amendment to Section 1963 expressly protects from forfeiture assets transferred to third-party purchasers. 18 U.S.C. § 1963(m)(2). The version of Section 1963 applicable to Defendant does not

include such language, but it does instruct the United States to make "due provision for the rights of innocent persons." This clause should be read to protect the interests of the third parties, especially since subsequent tracing of assets is unnecessary for forfeiture and the government may recover the amount spent in violation of Section 1962. Satisfaction of the forfeiture judgment is a matter of collection, and the government should be limited to Defendant's existing assets and those which he transferred in an effort to defraud the government.[2]

## CONCLUSIONS OF LAW

1. Defendant's receipt of money from Philip Keidaish constituted violations of 18 U.S.C. § 201(c)(3).

2. Violations of Section 201(c)(3) are predicate offenses under RICO, and Defendant's multiple instances constitute a "pattern of racketeering activity" for purposes of 18 U.S.C. § 1962.

3. The money received from Keidaish is "income derived directly ... from a pattern of racketeering activity," while money Defendant withdrew from bank accounts which represents a prior deposit of the tainted funds is "income derived ... indirectly from a pattern of racketeering activity" for 1962(a) purposes.

4. Defendant purchased the Colonial Manor Apartments in part with income derived directly or indirectly from his racketeering activity, but that investment was not in an enterprise engaged in interstate or foreign commerce and does not constitute a violation of Section 1962(a).

5. Since Defendant invested some tainted money in acquiring Colonial Manor, the proceeds of sale from Colonial Manor remain "income derived ... indirectly from a pattern of racketeering activity" under Section 1962(a).

6. Real Tech International, Silver Realty, and Costalotta Inc. constitute an "enterprise engaged in interstate ... commerce" for purposes of Section 1962(a).

7. Defendant in effect invested funds in or used funds through the enterprise to the extent of the purchase prices in making the following acquisitions in corporate solution:

| | | |
|---|---|---|
| Real Tech | Groometown Road | $172,170.00 |
| | 1980 Sea Ray | $ 63,232.00 |
| | 1979 Mercedes 450 SEL | $ 29,800.00 |
| | 1980 Mercedes 450 SL | $ 33,543.00 |
| Silver Realty | 1975 FMC | $ 32,000.00 |
| | 1979 Jeep CJ–7 | $ 8,194.23 |
| | 1980 Jeep CJ–7 | $ 8,247.20 |
| Costalotta | 1980 Bluebird Wanderlodge | $206,121.80 |
| | Total | $553,308.23 |

8. The money used to fund these acquisitions was income derived directly or indirectly from Defendant's racketeering activity.

9. Each purchase is a violation of Section 1962(a) and insofar as the assets are therefore "interests acquired or obtained in violation of Section 1962," either the purchase price or the asset itself is forfeitable to the government under Section 1963(a), except that in the case of existing assets transferred to bona fide purchasers the purchase price paid by Defendant and not the assets shall be forfeited.

10. Defendant also obtained the A–36 Bonanza by using or investing funds

---

2. To rule otherwise would be to treat the earlier version of Section 1963 as more stringent than the version introduced under the Comprehensive Crime Control Act of 1984. In fact, the 1984 version was enacted in part to stiffen the forfeiture provisions and prevent defendants from avoiding forfeiture by pre-conviction transfers. S.Rep. No. 225, 98th Cong., 2d Sess. 194, *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3377, *quoted in United States v. Bassett*, 632 F.Supp. 1308, 1312 (D.Md.), *aff'd, United States v. Harvey*, 814 F.2d 905 (1986), *reh'g en banc granted* (1987).

through an enterprise, but the funds are not traceable to Defendant's racketeering activity and hence the purchase does not implicate the forfeiture provision.

A judgment in accordance with the above Findings of Fact and Conclusions of Law shall be entered contemporaneously herewith.

## JUDGMENT

In accordance with the Findings of Fact and Conclusions of Law entered contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that the Defendant David Jack Vogt, Jr., SHALL FORFEIT to the United States of America assets in the amount of FIVE HUNDRED FIFTY–THREE THOUSAND THREE HUNDRED EIGHT and 23/100's DOLLARS ($553,308.23), including any of the assets specifically found to be forfeitable which are still in the Defendant's possession, in the possession of his wife or family, or which the Defendant has disposed of other than to an innocent third party.